UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

MELISSA R. MARTIN,

Plaintiff,

v.

WINN-DIXIE LOUISIANA, INC.,

Defendant.

Case No. 3:13-CV-00682-JWD-SCR

**ORDER AND RULING ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Lately pregnant, a long-term employee, a certain store's co-director, asks her direct supervisor for a restructured set of duties, i.e. an accommodation of responsibilities, none deemed "essential" or "primary." Her doctor advises it; the health of baby and mother demand it. To her, it seems neither unusual nor problematic, her proposed alterations having been previously afforded by her employer to many other colleagues laboring under similar physical limitations. The supervisor forwards the request to the corporate headquarters located on

Florida's Atlantic coast. Eventually, in response, an offer she cannot refuse is made: accept a demotion or take the leave to which the law entitles you. She takes the leave, as it makes the most sense. She needs the money, and the insurance is most crucial, while her fiancée cannot help, for he is unemployed. A healthy baby is born a few weeks late. Four weeks later, the new mother contacts Human Resources with the happy news—and an odd question: why will my store discount card no long work? The answer soon comes from HR: Ma'am, you were fired two weeks ago.  On the basis of this story, a complaint was drafted, and this case was born. The mother's name is Ms. Melissa R. Martin ("Martin" or "Plaintiff"); her employer is Winn-Dixie, Inc. ("Winn-Dixie" or "Defendant").[1]

At present, however, before the Court is one motion: Defendant's Motion for Summary Judgment ("MSJ"), (Doc. 31), filed after a motion to dismiss, (Doc. 17), but before this Court partly granted the latter, (Doc. 37).[2] Plaintiff has responded ("Plaintiff's First Opposition"), (Doc. 38), and after this Court dismissed all but five claims, a quintet of motions followed: a supplemental opposition by Plaintiff ("Plaintiff's Supplemental Opposition"), (Doc. 41), a reply by Defendant ("Defendant's Reply"), (Doc. 44), a sur reply by Plaintiff ("Plaintiff's First Sur Reply"), (Doc. 48), a first sur reply by Defendant ("Defendant's First Sur Reply"), (Doc. 55), and a second by Defendant ("Defendant's Second Reply"), (Doc. 58). In brief, Defendant maintains that no genuine issues of material fact exist as to each one of Plaintiff's remaining claims: (1) sexual/pregnancy discrimination in violation of the Pregnancy Discrimination Act ("PDA"), a part of Title VII of the Civil Rights Act of 1964 ("Title VII"); (2) Louisiana's

---

[1] Although the original filing lists multiple defendants, (Doc. 1), "Winn-Dixie Montgomery LLC" is the sole effective defendant at present, (Doc. 31). The shortened term "Winn-Dixie" or "Winn Dixie," and the singular Defendant, will therefore be used throughout this opinion.

[2] This gap explains why the MSJ delves into arguments already disposed, (Doc. 31-2), as Defendant later notes, (Doc. 44 at 1–2). Hence, in this opinion, this Court deals solely with those arguments unaffected by its March order.

pregnancy discrimination law; (3) sexual harassment in violation of Title VII; (4) sexual

harassment in contravention of Louisiana's equivalent; and (5) the distinct state tort of

intentional infliction of emotional distress ("IIED"). In the absence of such a dispute, Federal

Rule of Civil Procedure 56[3] demands judgment in its favor. Plaintiff contests Defendant's legal

analysis and its evidentiary characterization. She emphasizes that she has made the requisite

prima facie case for sexual discrimination and provided enough evidence to allow a reasonable

jury to find Defendant liable for both sexual harassment and IIED. One dispute over a technical

evidentiary matter and another focused on the issue of exhaustion are subsumed within the larger

controversy.

       This Court agrees and disagrees in part with Defendant. As a threshold matter, it rejects

Defendant's arguments that it must set aside and ignore Plaintiff's tardily submitted evidence—a

declaration by Mr. Wayne Ivy ("Ivy Declaration")—pursuant to Rules 26(a)(1) and 37(c)(1) and

treat Plaintiff's still extant claims as not properly exhausted. It does so because both contentions

defy the Rules' clear text, well-established case law, and the relevant documents. It also finds

that, based on federal and state discrimination law, Plaintiff has met her minimal burden as to

these two discrete claims. More than enough evidence exists to lead a jury to reasonably

conclude that Defendant discriminated against Plaintiff due to her pregnancy and has advanced a

purely pre-textual justification. While Defendant believes only nearly identical comparators will

do, sufficiently close comparators, the PDA's minimum, can be found. Meanwhile, the

descriptions provided of Plaintiff's former post contradict its assertions, and its agents have

offered contradictory testimony as to whether the physical activity that Plaintiff could not do—

lifting, pushing, and pulling up to eighty pounds—was truly an essential function. In contrast, as

---

[3] In this opinion, any and all references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

Plaintiff has failed to allege a sufficient quantum and level of actions by Defendant or its certain agents to support a harassment claim and has not offered the kind of proof necessary to support an IIED claim, this Court must dismiss those claims pursuant to Rule 56. Now, therefore, Plaintiff's claims for discrimination alone remain, as she has satisfied Rule 56's minimum.

As such, for the reasons more fully explained below, this Court GRANTS and DENIES IN PART the Defendant's MSJ.


## II.    FACTUAL BACKGROUND

### A.    Defendant's Policies

The purpose of a co-director is to "lead, manage and develop" her (or his) team and the store's operations. (Doc. 31-4 at 11–12.)  The non-exhaustive list of job functions leaves no doubt that the thrust of what the co-director must do is manage operations and recruiting and to delegate as appropriate. (*See id.*) Although Defendant reserved the right to change this list at its discretion, physical lifting, pushing, and pulling requirements were not designated as "primary" and "essential" at the time of Plaintiff's employment.[4] (*Id.*) Within the category of "primary (essential) functions," only the eighth and final task even alludes to such physical demands, as a co-director is expected to "[***m***]***anage*** facility assets, including promptly ***addressing*** maintenance and safety issues, and daily ***maintenance*** of floor conditions."[5] (*Id.* at 12 (emphasis added).) This written description goes on to warn that work hours can vary between days, evenings, weekends and holidays. (*Id.* at 15.)

Nonetheless, a co-director should be able to carry, push, lift or pull up to eighty (80)

---

[4] The Court here utilizes the description of the "co-director" position provided by Defendant and Plaintiff in their papers.

[5] Lexicographically, to "manage" and "address" does not necessarily mean that a co-director must be able to complete any such physically-demanding tasks on her or his own.

pounds for up to one-third of each work day. (*Id.* at 14). The listed percentage range for this physical activity, however, is between 1% and 33%. (*Id.*) In fact, a co-director is expected to sit ("frequently," defined as between 34-66%") and to stand and walk ("continuously," defined as between "67-100%") more often than to lift, push, or carry "up to 80" pounds. (*Id.*) Interestingly, defendant's counsel conceded as much during Sutton's deposition, objecting: "There's ***no*** category of ***essential physical*** demands. There's never, occasionally, frequently, continuously." (Doc. 31-5 at 9 (emphasis added).) While Sutton seemed to regard such physical tasks as "essential" in a colloquial sense—"You may have just one person open a store and have very little backup. And it would be essential that she be able to perform her duties if she was there by herself," (*id.* at 10)—he did not identify lifting, pushing, and pulling as amongst a co-director's essential "duties" when asked to describe that position's "essential" duties. Instead, he intoned: "To assist the store director with whatever he needs, in charge of profits, sales, making sure we attain our budgets, helping direct people in the store, setting ads for the upcoming week, just helping to maintain and run the store." (Doc. 31-5 at 5–6). In contrast, Ms. Myndi Savoy ("Savoy"), the human resources generalist for Winn-Dixie's Prairieville store, insisted that "unloading the trucks" was a "primary responsibilit[y]." (Doc. 31-6 at 5.) Regardless, the description does not explicitly prohibit co-directors from seeking help or using pallet trucks, jacks, or forklifts to accomplish any heavy lifting. (Doc. 31-4.)

Defendant's associate handbook ("Handbook") provides further detail. It states that all Winn-Dixie employees labor "at-will," employment terminable "by either the [a]ssociate or . . . [c]ompany at any time, for any reason, with or without notice." (Doc. 31-4 at 20.)[6] According to the Handbook, forty-hour weeks are considered to be a regular work period (plus any overtime

---

[6] According to her testimony, Martin had neither signed nor seen the Handbook included as evidence. (Doc. 31-3 at 8.)

on a "deemed necessary" basis). (*Id.* at 27.) Although the Handbook does not mention procedures for accommodating employees with disabilities such as pregnancy, it is Winn-Dixie's policy, consonant with its obligation under federal and state law, to "reasonably accommodate qualified applicants or associates with disabilities and who can perform the *essential* functions of his or her job, with or without accommodation." (Doc. 31-4 at 39 (emphasis added).) Like the written description provided for the co-director position, the Handbook does identify the pulling, lifting, and pushing requirement summarized on the former's final page as "essential" or "primary."

### B.      Plaintiff's Employment: Pre- and Post-Pregnancy

On December 15, 1995, Defendant hired Plaintiff as a part-time cashier. (Doc. 1-1 at 2; Doc 31-1 at 1; Doc. 38-1 at 2.) Over the next fifteen years, she held various positions at sundry Winn-Dixie stores located in and around Baton Rouge, Louisiana. (Doc. 31-1 at 1.) Eventually, Defendant promoted her to co-director, described as "the second most senior store-level management position" and as interchangeable with the term "co-manager" in the MSJ, while she was stationed at the store located on Burbank Drive. (*Id.* at 1 & 2 n.2; Doc. 38-1 at 2.) She was transferred to another store, sited in Prairieville and designated Store Number 1590 in Defendant's files, in October 2011. (Doc. 31-1 at 1–2; Doc. 38-2 at 2.) During her employment at this location, the store manager, also known as "store director," Mr. Chuck S. Sutton ("Sutton"), functioned as Plaintiff's direct supervisor. (Doc. 31-1 at 2; Doc. 1-1 at 2.) As co-director, Plaintiff routinely worked five ten-hour shifts per week, often far more during special seasons, (Doc. 31-1 at 3; Doc. 31-3 at 7–8), and was "the senior person at the store" in Sutton's absence, (Doc. 31-3 at 7). Sutton described her as an "average at best" employee and at one point

rated her job performance as "[o]n target," one level above "needs improvement" and below two "superior" and "almost superior."[7] (Doc. 31-5 at 6.)

On September 4, 2012, Plaintiff "discovered that she was pregnant" and "[a]lmost immediately" or "immediately" informed Defendant via Sutton. (Doc. 1-1 at 3; Doc. 31-1 at 3.) Sometime thereafter, Plaintiff's obstetrician/gynecologist, Dr. Lewis ("Lewis"), observed the pregnant Plaintiff "performing some type of heavy lifting." (Doc. 31-1 at 3.) Thereupon, on October 4, 2012, Lewis provided Plaintiff with a note restricting her from lifting no more than ten pounds and working no longer than eight hours. (*Id.*) On October 5, 2012, Plaintiff submitted this note to and requested a reasonable accommodation from Defendant; once more, Sutton served as the critical conduit. (*Id.*; Doc. 1-1 at 3.) On that day, Sutton faxed the doctor's note to Savoy who thereupon sent both to Defendant's legal department, located in Jacksonville, Florida. (Doc. 31-1 at 3; Doc. 31-5 at 8.) On that same day, presumably after speaking with Savoy, Sutton "advised" Plaintiff that she would "probably" need to "step down," taking "a part-time position" and a clear "demotion," and "gave . . . [P]laintiff an unfavorable annual evaluation." (Doc. 1-1 at 3; Doc. 31-1 at 4.) At that time, having reviewed her doctor's restrictions, Sutton attempted to accommodate Plaintiff by advising her "to self-administer" and herself avoid "working over eight hours, mak[ing] sure she left at eight hours[,] and mak[ing] sure she didn't pick up over 10 pounds." (Doc. 31-5 at 8.) According to Sutton, this "accommodation" lasted

---

[7] While Plaintiff disagrees with this description—"Ms. Martin had a stellar employment record with no write-ups or negative evaluations," "a highly regarded employee during her seventeen-year career with Winn-Dixie," (Doc. 38-1 at 3, 8)—this Court here summarizes the uncontested bare minimum and leaves disputed matters untouched. Questions, it would seem, do exist regarding Plaintiff's actual performance. For example, while Sutton claims to have orally communicated a decidedly more negative opinion of her work ethic to Plaintiff directly, his words alone support this story. (Doc. 31-5 at 6.) Perhaps to avoid this very problem, Winn-Divie policy now requires witnesses be present for any such discussions. (*Id.*)

until Plaintiff left.[8] (*Id.*)

On October 18, 2012, Sutton advised Martin to request a Leave of Absence ("LOA") and speak to the store's human resources department. (Doc. 31-1 at 4; Doc. 1-1 at 3.) Four days later, Plaintiff spoke with Sutton's own boss, Mr. Edwin Tucker ("Rucker"), who "advised [P]laintiff that he was not aware of her situation and would need to contact Mr. Sutton"; he directed Plaintiff to contact Savoy. (Doc. 31-1 at 4.) On or about October 25, 2012, Martin spoke with Savoy. (Doc. 31-1 at 4; Doc. 31-4 at 38.) Savoy gave Martin the LOA form; she also informed her that an accommodation would be impossible "due to the hardship it would place on the store for the length of time, and time of year, that she was requesting the restrictions." (Doc. 31-1 at 4; Doc. 31-4 at 38.) At this time, Plaintiff "was advised" that she could either seek leave pursuant to the Family Medical Leave Act of 1993, receiving "leave for twelve weeks with full pay" and "apply[ing] for an extension after the twelve weeks expired," (Doc. 1-1 at 3; *see also* Doc. 31-1 at 4–5), or accept an immediate demotion to part-time cashier, (Doc. 31-1 at 5; Doc. 1-1 at 4).

Subsequently, Plaintiff applied for and received leave until January 9, 2013. (Doc. 1-1 at 4; Doc. 31-1 at 5.) She had, however, been told that an extension until April 16, 2013, could later be sought. (Doc. 31-1 at 6.) Plaintiff eventually applied and was approved for short-term disability and long-term disability benefits through Winn-Dixie's third-party provider, effectively extending her leave through April 16, 2013. (*Id.* at 7.) She also "cashed in two weeks of PTO benefits." (*Id.*) In total, she requested leave through May 1, 2013, (*id.* at 6), though she apparently understood "that once [her] personal leave expired on April 16th, . . . her employment was going to end if . . . [she] didn't return to work," (Doc. 31-3 at 14; *see also* Doc. 31-1 at 8).

---

[8] The consistency and reality of this accommodation is impossible to gauge, for Plaintiff took a preplanned vacation soon after her pregnancy's disclosure, (Doc. 31-1 at 4; Doc. 31-5 at 10; Doc. 38-1 at 3).

Nevertheless, based on the plain text of Plaintiff's formal request for leave, Plaintiff and Defendant knew that she would "need" six weeks of post-birth recovery. (Doc. 31-1 at 7; *see also* Doc. 31-3 at 15–16.)

On March 31, 2013, Plaintiff gave birth. (Doc. 1-1 at 4.) Without delivering any explicit notice,[9] Defendant fired Plaintiff on April 26, 2013. (Doc. 31-1 at 8.) Having unsuccessfully attempted to use her employee discount card in early May 2013, the unsuspecting Plaintiff contacted Savoy regarding her possible return to work on May 4, 2013. (*Id.*) On May 8, 2013, Savoy informed Plaintiff that she had, in fact, been terminated on April 26th. (*Id.*; Doc. 1-1 at 4.)

## C.   Present Action's Pre-Termination Roots

Though Defendant fired Plaintiff in April 26, 2013, Plaintiff had first met with a lawyer regarding Defendant's allegedly discriminatory conduct in November 2012. (Doc. 31-1 at 9.) On January 9, 2013, Plaintiff charged Defendant with pregnancy discrimination by first filing, as required, an intake questionnaire for the Louisiana Commission on Human Rights ("LCHR") and Equal Employment Opportunity Commission ("EEOC").[10] (*Id.*; *see also* Doc. 1-1 at 5; Doc. 31-4 at 82–86.) The charge identified the "earliest" and "latest" dates of discrimination as October 15 and October 30, 2012, and dealt exclusively with Sutton's and Defendant's original (and alleged) response to Plaintiff's request for an accommodation: either demotion or forced leave. (Doc. 31-1 at 9; *see also* Doc. 17-2 at 1.) The charge did not mention Plaintiff's discharge, as it had not yet occurred, and no revised charge was ever filed. (*Id.* at 10; *see also* Doc. 37 at 8–12.) On

---

[9] Whether or not Defendant was required to do so is legally and factually irrelevant.

[10] LCHR handles complaints of employment discrimination based on race, color, religion, sex, disability, age, sickle cell trait, pregnancy, child birth and related medical conditions. LA. R.S. § 51:2231(C). When Plaintiff filed charges with LCHR, she simultaneously filed a charge with the EEOC. *See* U.S. EEOC, FILING A CHARGE OF DISCRIMINATION, *available at* http://www.eeoc.gov/employees/charge.cfm.

November 5, 2013, the EEOC issued Plaintiff the Notice of Right to Sue ("Notice"). (Doc. 31-4 at 91.)

### III.    PROCEDURAL BACKGROUND

### A.    Motions Filed

On September 24, 2013, forty-three days prior to the mailing date affixed to the Notice, (*id.*), Plaintiff commenced a suit for sexual discrimination, harassment, and retaliation, among other claims, in the Nineteenth Judicial District Court for the Parish of Baton Rouge, Louisiana, on September 24, 2013. (Doc. 31-1 at 10; Doc. 1-1 at 2, 6.) Pursuant to various subsections of the United States Code's twenty-eighth title,[11] Defendant removed Plaintiff's suit to this Court on October 16, 2013. (Doc. 1-1 at 1.) Defendant first filed a motion to dismiss, (Doc. 3), and then an answer, (Doc. 5), withdrawing the former on October 31, 2013, (Doc. 6, 7). As authorized by judicial order, (Doc. 11), the Supplemental and Amending Petition was filed on November 13, 2013, (Doc. 12), and Defendant tendered an answer to this new petition on November 19, 2013, (Doc. 13). The MSJ was docketed on February 27, 2015, (Doc. 31); Plaintiff's First Opposition arrived on March 25, 2015, (Doc. 38). On March 20, 2015, this Court dismissed Plaintiff's wrongful-termination and retaliation claims under both federal and state law. (Doc. 37.) Five claims—"one for harassment and one for sexual discrimination" under federal and state law, as well Plaintiff's IIED one—remained. (*Id.* at 12; *see also* Doc. 44 at 1-2 & 2 n.2.) Plaintiff thereupon asked and received permission to file supplemental briefing, and Defendant was granted additional time to file a response. (Doc. 39, 40.) Plaintiff's Supplemental Opposition, (Doc. 41), Defendant's Reply, (Doc. 44), Plaintiff's Sur Reply, (Doc. 48),

---

[11] Specifically, Plaintiff relied on 28 U.S.C. §§ 1331, 1367, 1441, and 1446. (Doc. 1-1 at 1.)

Defendant's First Sur Reply, (Doc. 55), and Defendant's Second Sur Reply, (Doc. 58),

followed.[12] This Court held oral argument on August 27, 2015. (Doc. 60, 61, 63.)


**B.**     **Defendant's Arguments: Overview**

Setting aside the contentions related to claims already dismissed, (Doc. 37), Defendant's

papers present a four-part argument for why no genuine issue of material facts remains as to

Plaintiff's discrimination, harassment, and tort claims.

Initially, Defendant argues for the exclusion of the Ivy Declaration, appended to

Plaintiff's First Opposition. (Doc. 38-4 at 11–13.) It offers two reasons: "Mr. Ivy was not

previously disclosed as a witness, within applicable pretrial deadlines," as required by Rule

26(a)(1), and the Declaration "is inadmissible because it is not based on personal knowledge,

includes hearsay, and/or amounts to inadmissible lay opinion." (Doc. 44 at 3; *see also, e.g.*, Doc.

48 at 2–4; Doc. 58 at 3–11.) Defendant specifically rejects Plaintiff's defense of the Ivy

Declaration as an impeachment tool, as it is both substantive and directed at no witness. (Doc. 44

at 3–5.) According to Defendant, Plaintiff's stated justification—she realized Ivy's value upon

the MSJ's filing—is belied by Ivy's own admission that he spoke to counsel "a couple months"

before the Declaration's execution, and Defendant seemingly questions the veracity of this

declaration. (Doc. 58 at 5–7.)  More specifically, it first points out that the First Opposition was

filed on March 25, 2013, the same date of the Ivy Declaration, (Doc. 38; Doc. 38-4), and the

MSJ was docketed on February 27, 2013, (Doc. 31). Emphasizing this twenty-six day gap,

Defendant argues that the assertion of Plaintiff's counsel—"Plaintiff's counsel did not learn of

Mr. Ivy until Defendant's Motion for Summary Judgment was filed, when Plaintiff

---

[12] These motions were filed on April 13, April 22, May 5, July 30, and July 31, 2015,
respectively. (Doc. 41, 44, 48, 55, 58.)

remember[ed] working with him at the Burbank store. He . . . was interviewed and his declaration taken *mere days before Plaintiff filed her opposition*"—reeks of certain falsity, Ivy having testified that he received his "first call" from Plaintiff's counsel "a couple of months" before the First Opposition's tendering. (Doc. 58 at 5–6 (emphasis in original)).

Defendant also insists that harm has resulted from the Ivy's late disclosure, for even a minor delay may upset trial preparation, it has spent time and effort to litigate this very issue, and it is unable to develop his testimony. (Doc. 44 at 8–9.) "Admission of the [d]eclaration [by Plaintiff's counsel] at this point deprives Defendant the opportunity to test . . . [her] account [of the Ivy Declaration] under cross-examination." (Doc. 58 at 6.) Harmlessness, it adds, was Plaintiff's obligation to prove. (Doc. 44 at 9; *see also* Doc. 58 at 8.)  It concludes by deriding the Ivy Declaration as being "neutral" only as to Plaintiff's accommodation claim, (Doc. 58 at 9), echoing its earlier argument that the Ivy Declaration "does nothing to further Martin's case," (Doc. 44 at 6). Its last filing summarizes its core assault on the Ivy Declaration: "In the exercise of reasonable diligence, Plaintiff had numerous opportunities to disclose that Ivy was a potential witness," moments it did not seize, and allowance of the Ivy Declaration now "effectively forces Winn-Dixie to pay the price of Plaintiff's professed lack of recall," with "the only evidence regarding that late disclosure completely and unquestionably controvert[ing] Plaintiff's account." (Doc. 58 at 11.)

Second, Defendant attacks the legal viability of Plaintiff's claims under Title VII and its Louisiana parallel. It does so in two ways. Primarily, "Plaintiff was not entitled to [an] accommodation," it writes, "because she was not 'qualified' for her Co-Director position, due to the ten-pound lifting restriction imposed by her physician"; much stress is paid to the position's written job description. (Doc. 44 at 5; *see also* Doc. 31-2 at 7–12.) However, "[e]ven assuming

Plaintiff was entitled to accommodation, summary judgment is still appropriate because Plaintiff cannot demonstrate, through competent evidence, that a similarly situated non-pregnant employee received more favorable treatment." (Doc. 44 at 5; *see also* Doc. 31-2 at 10–12.) In the course of this argument, Defendant raises doubt about the validity of Plaintiff's various comparators.[13] (Doc. 44 at 5–6; *see also* Doc. 31-2 at 10–12.)

Third, Defendant denies that Plaintiff's harassment claim can survive. So far, Plaintiff has only offered up "one instance of alleged harassment": "Sutton . . . offered her candy with the knowledge that she was on insulin-resistance medication." (Doc. 44 at 8; *see also* Doc. 31-2 at 16–17.) Subsequently, in response to Plaintiff's prior filing, Defendant concedes that a second has been offered: Sutton, allegedly, explicitly denied any person could be both pregnant and a co-director. (Doc. 44 at 8.) Still, in Defendant's judgment, two stray remarks over a period of years are insufficient as a matter of law to support Plaintiff's harassment claim, necessitating this count's fall under Rule 56.

Finally, Defendant deals with Plaintiff's state IIED claim. Generally, it points out that its agents' conduct, even if colored in the worst of lights, was not so outrageous and extreme as to offend decency itself, the high standard required under Louisiana law for the Plaintiff to prevail on her final claim for intentional infliction of emotional distress. (Doc. 44 at 8–9; *see also* Doc. 31-2 at 17–19.) To Defendant, it matters greatly that Plaintiff "has never sought treatment *of any kind* for her alleged distress," undercutting the alleged extremity of her distress. (Doc. 44 at 8–9 (emphasis in the original).) With no such evidence presented, the two comments made by Sutton

---

[13] As explained later, see in*fra* Part IV.C, "comparators" refers to the common use of similarly situated employees who do not belong to a plaintiff's protected class in discrimination cases so as to prove a defendant's asserted nondiscriminatory reason is mere pretext. This method has been described as "the most common" means of "proving pretext" in employment discrimination cases. Emma Reece Denny, *Mo' Claim Mo' Problems: How Courts Ignore Multiple Claimants in Employment Discrimination Litigation*, 30 LAW & INEQ. 339, 366 (2012).

are "grossly insufficient to sustain [her] intentional-infliction claim." (*Id.* at 9.)

## C.    Plaintiff's Side: Overview

Attaching twelve documents to its First Opposition,[14] Plaintiff takes aim at each of Defendant's evidentiary interpretations in its subsequent filings, concluding: "Genuine issues of material fact exist precluding the granting of summary judgment herein." (Doc. 38 at 1.) First, Plaintiff defends her use of the Ivy Declaration, for she intends to exploit it for impeachment purposes and its harm to Defendant is minimal. (Doc. 48 at 2–3.) More substantively, Plaintiff faults Defendant for not providing her with a reasonable accommodation, only demotion or leave, even though the latter had accommodated other individuals in "nearly identical circumstances," i.e. with similar physical restrictions.  (Doc. 38-1 at 4–6, 11.) These individuals include Ivy, Mr. Jeremy Lemoine, and Ms. Linda Gray. (*Id.* at 6 & n.15; Doc. 38-4 at 11–14; Doc. 41 at 4–6.) In her view, had Defendant simply accorded her similar treatment, she would be perfectly "qualified" to perform a co-director's every essential task, (Doc. 38-1 at 9, 11–12), especially since lifting was identified by Defendant as an "occasional duty" and not "an essential function," (Doc. 41 at 4).  Moving onto her harassment allegations, because Sutton knew Plaintiff to be a diabetic, "a condition that is protected by the Americans with Disabilities Act," a reasonable factfinder may find that legally actionable harassment occurred when Sutton offered her candy, and his lone comment—that a woman "couldn't be a Co-Director and be pregnant"— may reasonably convince that same observer of Defendant's pregnancy-tinged harassment.  (*Id.*

---

[14] A number were already offered by Defendant, including Plaintiff's deposition, (Doc. 31-3), co-director job description (Doc. 31-4), LCHR questionnaire (Doc. 31-4 at 33–39), FMLA application form (Doc. 31-4 at 51–53), Notice of Right to Sue, (Doc. 31-4 at 91), and the depositions of Sutton, Savoy, and Tucker (Doc. 31-5, 31-6, 31-7), and incorporated by reference in the First Opposition's body, (Doc. 38 at 1).

at 17–18.) Lastly, since Plaintiff "was pregnant, under financial stress, and extremely worried about losing her health insurance," Defendant "knew or should have known that . . . [its] actions were substantially likely to cause emotional distress," yet still "forced her to take leave, prematurely exhaust her FMLA benefits, and apply for disability insurance that reduced her income," causing her "much distress and worry." (*Id.* at 18, 19.)  For these reasons, a genuine issue of material fact still exists as to whether Defendant's actions were extreme or outrageous under Louisiana law. (*Id.* at 19.)

## IV.    DISCUSSION: APPLICABLE STANDARDS AND LAWS

### A.    Rule 56 Standard

A method for "promptly disposing" of meritless actions, FED. R. CIV. P. 56 advisory committee's note (1937), Rule 56(a) permits a party to "move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought," FED. R. CIV. P. 56(a); *Jones v. State Farm Mut. Auto. Ins. Co.*, 719 F.3d 447, 451 (5th Cir. 2013) (quoting *id.*). A court, in turn, must "grant summary judgment if . . . movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A genuine dispute about a material fact exists when the evidence presented on summary judgment is such that a reasonable jury could find in favor of the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). All facts and evidence must be viewed "in the light most favorable to the non-movant," *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 516 (5th Cir. 2010); *accord Blow v. City of San Antonio*, 236 F.3d 293, 296 (5th Cir. 2001), while "[t]he party moving for summary judgment bears the burden of identifying the portions of the record that

demonstrate the absence of a genuine issue of material facts," *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009) (citing to *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007)). In reviewing the record, all courts must carefully examine "the pleadings, depositions, answers to interrogatories, and affidavits to determine whether any genuine issue of material fact remains," *Courtney v. Arthur Andersen*, 264 F. App'x 426, 428 (5th Cir. 2008) (citing earlier version of Rule 56(c)). But, under Rule 56, no judge may "weigh evidence or evaluate the credibility of witnesses," *Morris v. Covan World Wide Moving*, 144 F.3d 377, 380 (5th Cir. 1998), for "[d]etermining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact," *Anderson*, 477 U.S. at 255.  Axiomatically, the substantive law applicable to the relevant claim determines a fact's materiality. *Id.* at 248; *see also, e.g.*, *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) (quoting *id.*).

## B.   Rules' Disclosure Requirements

Since its adoption, Rule 26(a)(1) has provided:

> [A] party must, without awaiting a discovery request, provide to the other parties . . . the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(i); *Standley v. Edmonds-Leach*, 783 F.3d 1276, 1281 (D.C. Cir. 2015) (citing *id.*); *cf.* John H. Beisner, *Discovering a Better Way: The Need for Effective Civil Litigation Reform*, 60 Duke. L.J. 547, 577 (2010) (discussing the history behind this mandatory disclosure provision). Rule 26(a)(1)'s purpose is "to accelerate the exchange of basic information about the case and to eliminate the paper work involved in requesting such information, and the

rule should be applied in a manner to achieve those objectives." FED. R. CIV. P. 26 advisory committee's note (1993 amend.); *see also Chiasson v. Zapata Gulf Marine Corp.*, 988 F.2d 513, 517 (5th Cir. 1993) ("The federal rules promote broad discovery so that **all** relevant evidence is disclosed as early as possible, making a trial less a game of blind man's bluff and more a fair contest." (emphasis in original) (internal quotation marks omitted)).

In a seminal case focused upon the classification of surveillance video evidence, the Fifth Circuit construed this provision and offered a particular denotation of "impeachment evidence." Having described substantive evidence's distinguishing criteria, the court proceeded to define "impeachment evidence" as "that which is offered to discredit a witness . . . to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] or [her] testimony." *Chiasson*, 988 F.2d at 517; *see also United States v. Watson*, 766 F.3d 1219, 1244–45 (10th Cir. 2014) (endorsing this definition); *Karr v. Four Seasons Mar., Ltd.*, No. 02-3413 SECTION "I" (2), 2004 U.S. Dist. LEXIS 6388, at *13, 2004 WL 797728, at *3 (E.D. La. Apr. 12, 2004) (quoting *Chiasson*, 988 F.2d at 517).[15] Notably, the *Chaisson* court endorsed and applied this definition of "impeachment evidence" in an expressly circumscribed context: "defendant's surveillance of a personal injury plaintiff" and directed at Chiasson's sworn testimony "at trial that her injuries have interfered with her daily activities because she 'can't do anything for too long of a period of time'." *Chiasson*, 988 F.3d at 516, 518.

Yet another rule authorizes punishment for a party's failure to comply with Rule 26(a)(1). FED. R. CIV. P. 37(c)(1). In pertinent part, Rule 37(c)(1) reads:

---

[15] Some courts appear to read the "impeachment" exception in Rule 26(a)(1)(i) more narrowly. *Glacier Land Co, L.L.C. v. Claudia Klawe Assocs., L.L.C.*, 154 P.3d 852, 865 (Utah Ct. App. 2006) (summarizing the existence of a split amongst the federal circuit courts).

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

*Id.*; *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (quoting rule). In the making of this determination, courts consider numerous factors, including (1) "the surprise or prejudice to the blameless party," (2) "the ability of the offender to cure any resulting prejudice," (3) "the amount of disruption to the trial that would result from permitting the use of the evidence," and (4) "the bad faith involved in not producing the evidence at an earlier date." *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.*, 138 F. Supp. 2d 1088, 1094 (N.D. Ill. 2001); *accord, e.g.*, *Lanard Toys, Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) (citing to *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003)). Many courts have deemed Rule 37(c)(1)'s exclusionary sanction as "mandatory." *Falconer v. Penn Mar., Inc.*, 421 F. Supp. 2d 190, 207 (D. Me. 2006).

In so doing, these courts—and Defendant here, (Doc. 44 at 4; Doc. 58 at 5)—have overlooked the safety valve written into Rule 37(c)(1). Its second sentence explicitly allows a court to substitute its exclusory sanction with any "other appropriate" punishments. Fᴇᴅ. R. Cɪᴠ. P. 37(c)(1) (referencing the sanctions listed in Rule 37(2)(A) as nonexclusive possibilities); *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Benefiencia de Puerto Rico*, 248 F.3d 29, 35 (1st Cir. 2001) (describing Rule 37(c) as affording "wide latitude"). Generally, courts should "carefully consider Rule 37(c), including the alternate sanctions available, when imposing exclusionary sanctions that are outcome determinative."[16] *Musser*, 356 F.3d at 760 (affirming

---

[16] Case law evidences some discord over this precise issue. The source of this confusion appears to be the advisory committee's note. When the Rule was first added in 1993, the committee described the exclusionary sanction as "automatic." Fᴇᴅ. R. Cɪᴠ. P. 37 advisory committee's note (1993 amend.); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001). As one appellate court observed, however, "[t]o the extent that the Advisory Committee

judgment but urging cautious application of Rule 37(c)(1)). Even an unquestioned violation of Rule 26(a)(1) therefore "does not compel the district judge to exclude testimony in its entirety" pursuant to Rule 37(c)(1). *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 783–84 (6th Cir. 2003); *see also, e.g.*, *M.V.B. Collision, Inc. v. Allstate Ins. Co.*, 728 F. Supp. 2d 205, 225 (E.D.N.Y. 2010) (observing that preclusion under Rule 37(c) should follow only once a court has determined that a party has failed to make a timely disclosure, this failure was without substantial justification or excuse, sanctions are warranted, and preclusion is appropriate*);* *Allstate Ins. Co. v. Nassiri*, No. 2:08-cv-00369-JCM-GWF, 2010 U.S. Dist. LEXIS 138220, at *14, 2010 WL 5248111, at *5 (D. Nev. Dec. 16, 2010) ("Rule 37(c)(1) does not, however, require the district court in all instances to exclude evidence as a sanction for late disclosure that is neither justified or harmless."). In exercising this discretion, courts have been reluctant to employ Rule 37(c)(1)'s exclusionary sanction when it practically "amount[s] to dismissal of a claim" and in the absence of "[a] finding that . . . noncompliance involved willfulness, fault, or bad faith, and without considering the availability of lesser sanction." *See, e.g.*, *Toyrrific, LLC v. Karapetian*, 606 F. App'x 365, 365–66 (9th Cir. 2015); *cf., e.g.*, *Lujan v. Cabana Mgmt.*, 284 F.R.D. 50, 68 (E.D.N.Y. 2012) ("Preclusion is a harsh remedy that should only be imposed in rare situations." (internal quotation marks omitted)); *Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000) (reminding courts that "in a case . . . where exclusion necessarily entails dismissal of

---

Note calls Rule 37(c)'s exclusion of evidence 'automatic' . . . that characterization cannot be squared with the plain language of Rule 37(c)(1) itself." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006). Most assuredly, the latter overrides the former. *See, e.g.*, *Pioneer Invs. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388, 113 S. Ct. 1489, 1494–95, 123 L. Ed. 2d 74 (1993); *Traylor v. Freeland & Kronz*, 503 U.S. 638, 643–44, 12 S. Ct. 1644, 1648, 118 L. Ed. 2d 280 (1992); *Bus. Guides v. Chromatic Commc'ns Enters.*, 498 U.S. 533, 540–41, 111 S. Ct. 922, 928, 112 L. Ed. 2d 1140 (1991), *superseded by* FED. R. CIV. P. 11 (amended 1993).

the case, the sanction must be one that a reasonable jurist, apprised of ***all*** the circumstances, would have chosen as proportionate to the infraction" (emphasis added)).

**C.**      **Applicable Substantive Law: Pregnancy Discrimination and Harassment under Federal Law**

Enacted in 1978, the PDA added new language to the definitions subsection of Title VII, the part of the Civil Rights Act of 1964 that forbids certain forms of discrimination by covered employers. *Young v. UPS*, 135 S. Ct. 1338, 1344, 191 L. Ed. 2d 279 (2015); *see also Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008). One clause clarifies that discrimination "because of sex" or "on the basis of sex" verboten under Title VII includes "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k); *Coleman v. Court of Appeals*, 132 S. Ct. 1327,  1340 n.2, 182 L. Ed. 2d 296 (2012) (quoting *id.*). The second reads: "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . .  as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k); *Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540, 547 (7th Cir. 2011) (quoting *id.*). A plaintiff may prove such disparate treatments claims by "either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in *McDonnell Douglas*."[17] *Young*, 135 S. Ct. at 1345. True, "disparate-treatment law normally permits an employer to implement policies that are not intended to harm members of a protected class, even if their implementation sometimes harms those members, as long as the employer has

---

[17] Thus, a substantial overlap exists among the various employment discrimination statutes. *See John v. NCI Bldg. Sys., Inc.*, 537 F. Supp. 2d 848, 859 (S.D. Tex. 2008). Consequently, "in analyzing a claim of pregnancy discrimination we apply the same rules used for discrimination claims in general." *Garcia v. Woman's Hosp.*, 97 F.3d 810, 813 (5th Cir. 1996).

a legitimate, nondiscriminatory, nonpretextual reason for doing so." *Id.* at 1350; *cf. EEOC v. Warshawsky & Co.*, 768 F. Supp. 647, 656 (N.D. Ill 1991) ("Disparate treatment suits require either proof of discriminatory intent or establishment of a *prima facie* case of disparate treatment without actual proof of intent."). Its second clause, however, was deliberately designed in part to temper this juridical predilection by overturning an older Court's "determination that an employer can treat pregnancy less favorably than diseases or disabilities resulting in a similar inability to work" so long as a legitimate reason is proffered. *Young*, 135 S. Ct. at 1353 (referring to *Gen. Elec. Co. v. Gilbert*, 429 U. S. 125, 97 S. Ct. 401, 50 L. Ed. 2d 343 (1976)). Reminding courts that the making of a prima facie case should not be "as burdensome as succeeding on an ultimate finding of fact as to a discriminatory employment action," a plaintiff alleging "that the denial of an accommodation constituted disparate treatment" under this second clause "may make out a prima facie case by showing . . . [1] that she belongs to the protected class, [2] that she sought accommodation,[3]  that the employer did not accommodate her, and [4] that the employer did accommodate others similar in their ability or inability to work." *Id.* at 1354 (internal quotation marks omitted); *see also, e.g.*, *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) ("In the Rule 56 context, a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment."). Notably, in *Young*, the Court expressly "noted that the approach described in the decision is limited to the Pregnancy Discrimination Act." *Verrett v. Johnson*, No. 14-1854-SS, 2015 U.S. Dist. LEXIS 116111, at *28, 2015 WL 5125202, at *11 (E.D. La. Sept. 1, 2015) (construing *Young*, 135 S. Ct. at 1355). Federal courts have long recognized the possibility of a separate pregnancy/sexual harassment claim under Title VII, *Nieves v. Adecco Emp't*, No. 1:07-cv-01433-WTL-TAB, 2010 U.S. Dist. LEXIS 36547, at *9, 2010 WL 1474389, at *4 (S.D. Ind. Apr. 12, 2010) (collecting

cases), as Plaintiff and Defendant recognize, (Doc. 1-1; Doc. 44 at 8). To make a prima facie

case of hostile work environment on this basis, a plaintiff typically does not need to point to a

specific adverse employment action. *Tilson v. City of Lawrence*, No. 1:06-cv-1641-DFH-JMS,

2008 U.S. Dist. LEXIS 63945, at *23, 2008 WL 3914989, at *8 (S.D. Ind. Aug. 20, 2008).

Instead, she must show that (1) she belongs to a protected group, (2) she was subjected to

unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected

a term, condition, or privilege of her employment, and (5) the employer knew or should have

known of the harassment in question and failed to take prompt remedial action. *Harvill v.

Westward Commc'ns, L.L.C.,* 433 F.3d 428, 434 (5th Cir. 2005) (citing *Woods v. Delta Beverage

Grp., Inc..,* 274 F.3d 295, 298 (5th Cir. 2001)). For harassment to be actionable, "it must be

sufficiently severe or pervasive to alter the conditions of employment and create an abusive

working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399,

2405, 91 L. Ed. 2d 49 (1986).

## D.     Applicable Substantive Law: Discrimination, Harassment, and Distress under Louisiana Law

Echoing Title VII, Louisiana has declared it unlawful for "an employer to intentionally

discriminate against an individual with respect to his compensation or his terms, conditions, or

privileges of employment, because of the individual's sex." LA. R.S. § 23:332(A). As a

consequence of these laws' shared scope, as Defendant notes, (Doc. 31-2 at 2 n.2), "Louisiana

courts have looked to federal jurisprudence to interpret Louisiana discrimination laws," *King v.

Phelps Dunbar, LLP*, 743 So. 2d 181, 187 (La. 1999). As one would expect, this state's courts

have employed the same *McDonnell Douglas* framework applicable to PDA discrimination

claims, *White v. Golden*, 982 So. 2d 234, 242 (La. Ct. App. 2008); *Motton v. Lockheed Martin Corp.*, 900 So. 2d 901, 909 (La. Ct. App. 2005); *cf. Duet v. Martin Marietta Corp.*, 720 So. 2d 1290, 1293 (La. Ct. App. 1998) (applying the test to a claim of age discrimination), and crafted a four-part test for sexual harassment identical to the federal variant, *White*, 982 So. 2d at 243–44. Naturally, therefore, a plaintiff who fails to meet his or her burden under Title VII—or who succeeds in doing so—will simultaneously fail to satisfy—or concurrently demonstrate—the prerequisites set forth in Louisiana law.

In contrast, Plaintiff's IIED claim arises entirely from state tort law. As the Supreme Court of Louisiana has explained,

> [I]n order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*White v. Monsanto Co.*, 585 So. 2d 1205, 1209 (La. 1991); *accord Prest v. La. Citizens Prop. Ins. Corp.*, 125 So. 3d 1089 n.5 (La. 2012).  This standard is undeniably high, "outrageous" and "extreme" conduct "go[ing] beyond all possible bounds of decency, and . . . atrocious and utterly intolerable in a civilized community." *White*, 585 So. 2d at 1209 (relying on the RESTATEMENT (SECOND) OF TORTS § 12 (5th ed. 1984)). "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"; "[p]ersons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Id.*; *see also Labove v. Raftery*, 802 So. 2d 566, 578 (La. 2001) (quoting *id.*). For more than two decades, Louisiana's courts have unwaveringly adhered to this

unusually strict standard. *Labove*, 802 So. 2d at 578.

## V.      APPLICATION

### A.      Preliminary Matters

**1.**      **Ivy Declaration**

Defendant's assault on the Ivy Declaration can pass no muster for any number of reasons, each independently sufficient.[18]

First, the Ivy Declaration arguably impeaches Defendant's factual claims as voiced by its quoted agents, Defendant's assault dependent on an unduly narrow construction of *Chiasson*. True, the *Chiasson* court defined "impeachment evidence" as "that which is offered to discredit a witness . . . to reduce the effectiveness of [her] testimony by bringing forth evidence which explains why the jury should not put faith in [her] or [her] testimony," *Chiasson*, 988 F.2d at 517; on this fact, Defendant heavily relies, (Doc. 58 at 3). However, despite this opinion's facial reference to "a witness," data directed at undermining the credibility of the assertions of any party is  customarily considered "impeachment evidence," *see Chiasson*, 988 F.2d at 516 (implying that evidence's impeachment designation depends on whether it makes another's evidence, not simply testimony, believable), and has been thusly construed by other courts before and after *Chiasson*, *see, e.g.*, *Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 435 (D. Md. 2006) ("Impeachment evidence is used to encourage the trier of fact to look critically at whether the evidence should be believed."). Here, the Ivy Declaration is directly intended—and, in fact, does—contradict the factual assertions regarding Defendant's accommodations

---

[18] Of course, this conclusion applies only as to the declaration's usefulness for purposes of this motion's adjudication. Its admission at trial will implicate wholly other and unrelated issues and concerns.

procedures made in Defendant's MSJ, as buttressed by the declaration of at least one of witness, Ms. Linda Gray, (Doc. 31-9 at 2), and the depositions of Sutton, (Doc. 31-5), and Savoy, (Doc. 31-6). In general tenor, then, the Ivy Declaration serves the kind of purpose for which impeachment evidence is typically employed: undermining another's factual claims, whether conveyed by the witness or a party.

Alternatively, regardless of its classification as impeachment, substantive, or hybrid evidence,[19] Rule 37(c)(1) does not compel exclusion in these circumstances. As noted above, see *supra* Part IV.B, four factors are traditionally considered in defining such a failure as harmless: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness," *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999); *see also David v. Caterpillar, Inc.*, 324 F.3d 851 (7th Cir. 2003) (same); *MicroStrategy, Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) (applying a five-factor version of this same test). Here, their application undermines Defendant's assertion that it has been harmed in a sufficiently meaningful sense to justify Rule 37(c)(1)'s most onerous sanction.[20]

First, as Defendant seemingly recognizes, (Doc. 58 at 8–11), much of the Ivy Declaration divulges facts or factual allegations which supplement Plaintiff's prior points and which were readily within Defendant's purview. Ivy, after all, only repeats and further substantiates the

---

[19] Much evidence, arguably including the Ivy Declaration, can be classified as both impeachment and substantive evidence. *Cf. Behler v. Hanlon*, 199 F.R.D. 553, 558 (D. Md. 2001).

[20] The Court feels bound to here touch upon Defendant's remark that harm exists simply because it had to file supplemental briefing. (Doc. 58 at 8.) By that standard, harm must always be found when a complaint is filed, and the mere obligation to respond to another's briefing amounts to a kind of harm. Properly read, the Rule's "harm" refers to more than the time and expense associated with responding to a motion.

allegations that Plaintiff has made in her complaint and which Defendant has already attacked in the MSJ. It cannot be truly surprised that Plaintiff found someone to contradict the protestations of innocence and good faith that its own agents have propounded in written or oral form. Second, since Ivy's emergency, Defendant has enjoyed the significant opportunity to cure any resulting prejudice by cross-examining him months before trial. As its latest filings reveal, it has been able to probe Ivy's every avowal in his summer deposition, (Doc. 58-1), and it would seem to reason that it has gathered much of the evidence necessary for Ivy's cross-examination if he ever takes the witness stand.  As such, the very danger whose minimization, if not extermination, animated the adoption of Rule 37(c)(1)—"the practice of 'sandbagging' an adversary with new evidence" on the eve of trial, *Ritchie Risk-Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 156 (S.D.N.Y. 2012) (citing to *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004), and, *Johnson Elec. N. Am., Inc. v. Mabuchi Motor Am. Corp.*, 77 F. Supp. 2d 446, 458–59 (S.D.N.Y. 1999))—is thus not present here. Similarly, having had and exercised this option in June 23, 2015, Ivy's testimony, if later allowed, cannot be said to substantially disrupt counsels' trial preparation. His sworn words, ready to be deployed, have already been recorded, and Defendant enjoyed its opportunity to question Ivy 139 days before this matter's scheduled trial date.[21] Finally, though Defendant impliedly questions counsel's good faith, finding suspicion in the fact that Ivy testified to being interviewed "months" before the Declaration's date, Defendant overstates the import of Ivy's testimony. (Doc. 58 at 5.) Upon persistent questioning—"[W]as [i]t before or after Christmas of December of 2014?"—Ivy could give no precise date. (*Id.*) The Declaration was filed on March 25, 2015, (Doc. 38); the MSJ was docketed in February 2015, (Doc. 31); and Ivy testified he was *called* "a couple of months"

---

[21] Defendant deposed Ivy on June 23, 2015, (Do. 58-1), and trial is scheduled for November 9, 2015, (Doc. 49).

before March 25, 2013, (Doc. 58 at 5). By no stretch is the phrase "a couple months," a colloquialism bereft of fixed meaning, so precise as to lead any fair reader to conclude that Plaintiff *interviewed* Ivy before the MSJ was filed, as she claims in her declaration, (Doc. 45-2 at 2–3). Considering the fact that Rule 37(c)(1)'s exclusionary sanction is textually discretionary, *see supra* Part IV.B, a fact that Defendant ignores, (Doc. 44 at 4 (stating that, absent harmlessness or substantial justification, "the exclusion of testimony contemplated in Rule 37(c)(1) is self-executing")), these four factors undermine the case for the Ivy Declaration's exclusion.

In this regard, this Court finds *Chiasson* instructive. There, plaintiff was wholly "unaware that any recorded evidence or statements existed," *Lucas v. City of Shelby*, 246 F. Supp. 2d 516, 524 (N.D. Miss. 2002) (distinguishing *Chiasson*), and the defendant had refused to respond completely to a specific interrogatory asking about videotapes, *Chiasson*, 988 F.3d at 514; *see also Harrison v. Taiwan Super Young Co.*, No. 95-55745, 1997 U.S. App. LEXIS 274, at *5, 1997 WL 3627, at *2 (9th Cir. Jan. 2, 1997) (so distinguishing *id.*). Just as critically, both parties conceded the videotape's "fundamental effect on the outcome of the litigation" and the "obvious[ness]" of its effect on the issue of damages. *Chiasson*, 988 F.2d at 518; *see also Caskey v. Man Roland, Inc.*, No. 94-20482, 1996 U.S. App. LEXIS 45287, at *12, 1996 WL 197370, at *4 (5th Cir. Mar. 18, 1996) (emphasizing these distinctions). Arguably, its underlying principle "assumes that the surveilling party intends to use the surveillance at trial." *Fletcher v. Union Pac. R.R.*, 194 F.R.D. 666, 673 (S.D. Cal. 2000). Here, as discussed above, the Ivy Declaration does not threaten to surprise Defendant on the eve of trial or to allow Plaintiff to ambush Defendant, and Defendant's June deposition of Ivy has afforded it more than enough time to prepare an effective cross. With the Ivy Declaration not likely to be dispositive to this case's

merits, as the videotape proved in *Chiasson*, this Court is not inclined to read this frequently circumscribed case as broadly as Defendant argues.

In shotgun fashion, Defendant attacks the Ivy Declaration for other reasons as well, including hearsay and lay opinion. (Doc. 44 at 3.) However, Ivy's opinions and alleged facts appear based on his personal experience as a director and co-director, which reasonably include supervision of co-director and cashier activities as well as accommodation practices and policies, and is offered against Defendant by the latter's agent. Reasonably, if not indisputably, either fact arguably places Ivy's words outside the hearsay prohibitions in the Federal Rules of Evidence. FED. R. EVID. 801(d)(2)(A), 602; *see also, e.g.*, *In re Cornfield*, 365 F. Supp. 2d 271, 277 (E.D.N.Y. 2004) (observing that the former "provides for several types of party-opponent admissions - such as adoptive admissions, or statements made by an agent"); FED. R. EVID. 602 advisory committee's note ("This rule does not govern the situation of a witness who testifies to a hearsay statement as such, if he has personal knowledge of the making of the statement. Rules 801 and 805 would be applicable."). Additionally, all parts of the Ivy Declaration appear to be rationally based on Mr. Ivy's own perception as a former director and manager of cashiers and co-directors and as a co-director himself, and the Plaintiff asserts and the declaration bears out that its purpose is to cast doubt on Winn-Dixie's argument that pregnancies are accommodated. So construed, the Ivy Declaration contains no assertions of knowledge beyond the scope of Ivy's employment as a manager and readily fall within the exception for lay opinion set in rule 701. FED. R. EVID. 701; *cf.* FED. R. EVID. 701 advisory committee's note ("The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact.").

Based on the foregoing reasons, this Court will consider the Ivy Declaration to the extent that it buttresses the factual allegations previously made by Plaintiff in her complaint and other

filings.

2.  **Exhaustion**

*(a)*  *Parties' Relevant Arguments*

Winn-Dixie argues that Martin has improperly brought the related state and federal law claims because she failed to administratively exhaust them with the EEOC and LCHR. To support this assertion, Winn-Dixie claims that although the EEOC charge was brought within the statutorily prescribed time, it did not allege she was subject to harassment or a hostile work environment. (Doc. 31-2 at 14.) On the issue of claim exhaustion, Martin attempts to rebut Winn-Dixie's assertion by stating that the court had already dismissed the discharge and retaliation claims because they had not been exhausted, and purposefully excluded the harassment and discrimination claims. (Doc. 38-1 at 1.) Plaintiff does not respond to Winn-Dixie's assertion that she did not properly articulate sexual harassment and the presence of a hostile work environment in her EEOC charge.

*(b)*  *Analysis*

The LCHR and EEOC have a work-sharing agreement whereby they operate as each other's agents "for the purpose of receiving and drafting charges." *Troxclair v. Patrick F. Taylor Found.*, No. 08-1128 Section: 1/3, 2008 U.S. Dist. LEXIS 61281, at *6, 2008 WL 3559474, at *2 (E.D. La. August 12, 2008) (quoting the LCHR's work-sharing agreement with the EEOC); *see also, e.g.*, *Shuler v. Pricewaterhousecoopers, LLP*, 514 F.3d 1365, 1372 (D.C. Cir. 2008) (quoting identical language from EEOC's work-sharing agreement with the District of Columbia Office of Human Rights); *Sterling v. Contec Corp.*, 333 F. Supp. 2d 37, 39 (N.D.N.Y. 2004)

(same as to agreement between the EEOC and the New York State Division of Human Rights).

As the agreement adds, "[t]he EEOC's receipt of charges on the [LCHR]'s behalf will

automatically initiate the proceedings of both the EEOC and the [LCHR] for the purposes of

Section 706(c) and (e)(1) of Title VII." *Troxclair*, 2008 U.S. Dist. LEXIS 61281, at *6, 2008 WL

3559474, at *2; s*ee also* LA R.S. § 51:2231(A) ("[I]t is the purpose and intent of the legislature

[in creating LCHR] . . . [to] assure that Louisiana has appropriate legislation prohibiting

discrimination in public accommodations sufficient to justify the deferral of cases by the federal

Equal Employment Opportunity Commission."). As explained by the Fifth Circuit,

> [W]hen a claimant submits an EEOC charge and, pursuant to a work-sharing
> agreement, the EEOC accepts it on behalf of a deferral state, the claimant is
> deemed to have initially instituted proceedings with the state agency and the 300-
> day period is triggered.

*Conner v. La. Dep't of Health & Hosps.*, 247 F. App'x 480, 481 (5th Cir. 2007) (citations

omitted); *see also Price v. Choctaw Glove & Safety Co., Inc.*, 459 F.3d 595, 598 n.7 (5th Cir.

2006) (stating that in order to file suit under Title VII, a plaintiff first must file a charge with the

EEOC within a certain time period . . . "[i]n "deferral jurisdictions" [e.g. Louisiana], an extended

300-day period."). If and once the EEOC issues a right-to-sue letter to the party who has filed the

EEOC charge, that party has 90 days to file a Title VII action.

 While no formal LEDL charge was filed or proceeding adopted, an EEOC charge was

evidently received on May 1, 2013, about 184 days after the latest indicated discrimination

event. (Doc. 17-2.) By law, this act effected a simultaneous filling with the LCHR. On its face,

this filing was made before Plaintiffs termination on April 26, 2013, and it readily meets the 300-

day requirement for Louisiana. Juxtaposition with the termination date is irrelevant as to the

discrimination, which occurred between "10-15-2012" and "10-30-2012." (*Id.*) Numerically,

therefore, Plaintiff has met the time requirements for administratively exhausting her claims.

Winn-Dixie, however, argues more. Specifically, it contends that even if the time requirement is met, Martin should not be able to sue on sexual discrimination because she failed to properly articulate it in her charges, as Martin only brought up the lack of reasonable accommodation and dual-option of an LOA or demotion to cashier, thereby failing to suitably articulate her sexual harassment and hostile environment claims. (Doc. 31-2 at 4.) As Defendant rightly emphasizes, "Title VII requires employees to exhaust their administrative remedies before seeking judicial relief." *Stone v. La. Dep't of Revenue*, 590 F. App'x 332, 337–38 (5th Cir. 2014). Such a charge must state "sufficient facts to trigger an EEOC investigation and to put an employer on notice of the[ir] existence and nature." *Id.* While Defendant maintains Plaintiff's charge, upon whose basis the Notice of Right to Sue issued, was insufficient to constitute exhaustion, this Court disagrees, its reasons three.

First, the Plaintiff did more than Defendant believes. Looking at the plain forms submitted, Martin checked the box and represented that she was discriminated on the basis of "sex" and "(pregnancy)," due to "deni[al] of a reasonable accommodation by Chuck Sutton, Store Director." (Doc. 38-5 at 15-20.) She also avers that Sutton told her she "would have to step down or be demoted" and that HR representative Savoy told her "due to length and holidays with [her][] restrictions it would be best for LOA and the only position [she][] could do with restrictions is a part time cashier." (*Id.* at 17.) True, in her charge Martin does not allege that she was treated differently than "other persons not so affected but similar in their ability or inability to work," 42 U.S.C.A. § 2000e-2. However, she does provide sufficient indicia of poor treatment so that Defendant could not have reasonably understood, for purposes of Rule 56, the gravamen of her prospective complaint.

Second, Defendant relies on an unduly broad construction of *Stone*. In *Stone*, the Plaintiff filed an EEOC charge prior to her resignation, alleging, Title VII racial discrimination. The Fifth Circuit affirmed the district court's dismissal of her suit based on an EEOC charge that fail[ed] to identify "facts . . . that reasonably encompass[ed] her later claims for constructive discharge, disparate impact or disparate treatment." *Stone,* 590 F. App'x. at 338. Ostensibly applicable to Plaintiff's situation, *Stone* is, in fact, readily and easily distinguishable.  There, the plaintiff brought suit on multiple issues, some of which were not alleged in her specific charge. Here, all the Defendants can say is that the issues at bar were not adequately described in the charge, not that they were materially different than the ones being brought. Indeed, the charge specifically states the bases of the present suit—pregnancy and retaliation on the bases of Plaintiff's alleged failure to complete essential job functions or receive a reasonable accommodation, (Doc. 38-5 at 15-20)—and cannot really be regarded as having omitted or mischaracterized the purported misconduct. Furthermore, the standard set forth in *Stone* is not as strict on laypersons filing EEOC charges as Defendant now holds it to be:

> An employee may file a lawsuit 'not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination.'

*Stone*, 590 F. App'x. at 332 (internal citations omitted). Finally, other circuits have accepted weak charges by considering facts alleged in the pre-complaint questionnaire. For instance, in *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091 (9th Cir. 2002), the court ruled that Plaintiff had exhausted her claim by describing Defendant's harassing verbalizations in the questionnaire while only checking the boxes marked "race," "sex," and "harassment" on the charge. Like the Plaintiff in *B.K.B.*, Martin alleged in the LCHR intake questionnaire that Winn-Dixie treated

another similarly situated employee, Ms. Jeremy Lemoine, differently than it treated her. (*See*

Doc. 31-4 at 34, 38.) Both the LCHR and the EEOC did have the pertinent data underlying the

present complaint, even if Plaintiff's original submission was not perfect in terminology and

description.

Third, interests of justice and efficiency, the virtues enthroned in Rule 1, strongly favor

these claims' adjudication. A "complainant may [only] amend a complaint at any time *prior* to

the conclusion of the investigation to include issues or claims like or related to those raised in the

complaint, and new complaints must be filed within 300 days of the alleged discriminatory acts.

EEOC, COMPLAINT PROCESSING PROCEDURES (emphasis added), *available at*

http://www.eeoc.gov/eeoc/publications/fedprocess.cfm.  Since EEOC has closed its investigation

and since it has been well over 300 days since the events in question took place, dismissal of the

case would result in the Plaintiff losing the ability to address these claims even though a right to

sue letter was issued on the basis of a complaint sufficiently clear, if not crystal clear, about

Plaintiff's pending claims. In such circumstances, a precept's application should be an "exercise

in technical hair-splitting, but in in the context of its particular purposes as well as in the context

of "securing a fair trial for all concerned." *Tamez v. City of San Marcos*, 118 F.3d 1085, 1089

(5th Cir. 1997) (discussing de minimis departures technical compliance with Rule 50(b)).

Unwilling to pay heed to formality for its own sake, this Court does not find any merit in

Defendant's exhaustion argument.


**B.**     **PDA Claim**

As Plaintiff recognizes, *Young* essentially affirmed a preexisting standard for a plaintiff

alleging "that the denial of an accommodation constituted disparate treatment." *Young*, 135 S.

Ct. at 1345 (citing *McDonnell Douglas*, 93 S. Ct. at 1817); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (observing that at summary judgment "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive."). A plaintiff, it explained, "may make out a prima facie case by showing . . . [1] that she belongs to the protected class, [2] that she sought accommodation,[3] that the employer did not accommodate her, and [4] that the employer did accommodate others similar in their ability or inability to work." *Young*, 135 S. Ct. at 1354; *cf. Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 994 (5th Cir. 1996). Of course, a plaintiff can also show that she was a victim of intentional discrimination by proceeding under the direct method. *See Rhodes*, 359 F.3d at 504. Generally, "[d]irect evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

1. **Parties' Relevant Arguments: Disputing Two Elements of Plaintiff's Prima Facie Case**

Defendant's attack on Plaintiff's Title VII case is threefold. First, Defendant claims: "[P]laintiff has not presented any direct evidence of discrimination." (Doc. 31-2 at 7.) Next, Winn-Dixie argues that Plaintiff was not qualified for her post. (*Id.* at 8.) Third, it insists that Plaintiff cannot show she was denied a reasonable accommodation that was offered to other similarly situated persons. (*Id.* at 10–11; *see also* Doc. 44 at 5–7.) In other words, Defendant concedes that Plaintiff has articulated the first two elements—her membership in a protected class and her request for an accommodation—of the PDA's required prima facie case.

**2.      Plaintiff's Sufficient Showing: Direct Evidence, Accommodation Requirement, Comparators, and Pretext**

Subject to the constraints imposed by Rule 56, Defendant has not credibly undermined "the mosaic of circumstantial evidence from which a reasonable juror could infer intentional discrimination" under the disparate approach and in violation of the PDA. *Serednyj*, 656 F.3d at 549. One category of circumstantial evidence "consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994); *see also Smith v. Equitrac Corp.*, 88 F. Supp. 2d 727, 736 (S.D. Tex. 2000) (citing *id.*). "The second category consists of evidence that similarly situated employees outside of the protected group (pregnancy, sex, race, etc.) received systematically better treatment." *Serednyj*, 656 F.3d at 549; *accord Baker v. Enter. Leasing Co. of Indianapolis*, No. 1:10-cv-1556-RLY-DML, 2012 U.S. Dist. LEXIS 135331, at *13, 2012 WL 4358740, at *5 (S.D. Ind. Sept. 21, 2012) (quoting *id.*). "The third category consists of evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination." *Troupe*, 20 F.3d at 736.  For three different reasons, genuine disputes still exist, and a reasonable factfinder may yet find in Plaintiff's favor.

First, Plaintiff does offer up some direct evidence of discrimination. The undisputed (for

purposes of summary judgment)[22] fact is that prior to giving her the option to be demoted or go

on leave with no prospect of return, Sutton told Plaintiff that she "couldn't do [her][] job as Co-

Director and be pregnant." (Doc. 31-3 at 10.) Taking all inferences in Plaintiff's favor, such a

remark satisfies the Fifth Circuit's standard for ascertaining such blunt statement's probative

value, as Sutton's remark "related to the protected class of persons of which the [P]laintiff . . .

[was] a member" (i.e. pregnant women), was "proximate in time to the employment decision at

issue" and related  "to the employment decision at issue" (i.e. Plaintiff's attempted

accommodation and Defendant's offer of either demotion or leave), and were made by someone

with some ill-defined "authority over the employment decision at issue." *Krystek v. Univ. of S.

Miss.*, 164 F.3d 251, 256 (5th Cir. 1999). Notably, Sutton's own testimony feeds this possible

inference due in part to discrepancies in the avowals made by Defendant's other agent, for while

Savoy testified that decisions regarding accommodations are made at Defendant's corporate

headquarters, Sutton also testified that attempted to accommodate Plaintiff by ordering her to

"self-administer" and reducing her lifting expectations. (Doc. 31-5 at 7, 8.) In fact, following

Rule 56's mandate to make any reasonable inferences in the nonmovant's favor, other courts

have treated statements like Sutton's as direct evidence of pregnancy discrimination. *See, e.g.*,

*E.E.O.C. v. CTI Global Solutions, Inc.*, 815 F. Supp. 2d 897 (D. Md. 2011) (denying summary

judgment in part, finding direct evidence that Plaintiff's supervisor told her that she would be

removed from her job because she was pregnant and out of fairness to other employees).[23]

     Second, Defendant has misconstrued the third step of the *McDonnell Douglas* test, which

---

[22] This Court deems this statement's existence undisputed at this time and for Rule 56's limited
ends since Martin repeatedly brings it up, (Doc. 38-1 at 3; Doc. 38-2 ¶¶ 77, 81, 86), and Winn-
Dixie admits that it might be true, (Doc. 44 at 8).

[23] Other disputed direct evidence, which too must be construed in Plaintiff's favor, will be
addressed in the accommodation discussion.

only requires that the Plaintiff prove the Defendant-mover "did not accommodate" her, not whether it was reasonable not to do so. *Young*, 135 S. Ct at 1354.[24]  Only after the *prima facie* case is proven, does the burden shift to the Defendant to show an "apparently 'legitimate' reason for its actions." *Young*, 135 S.Ct at 1354. Plaintiff has alleged she was not accommodated, and Defendant has conceded that "a leave of absence," the accommodation it allegedly provided, did not necessarily and incontestably constitute a reasonable accommodation as a matter of law.

Third, Plaintiff's comparators could lead a reasonable factfinder to find that Defendant "did accommodate others similar in their ability or inability to work," *Young*, 135 S. Ct. at 1354, the final step of Plaintiff's prima facie case.  Defendant first argues that two of Plaintiff's comparators—Mses. Andrea Lang and Dody Vidrine—cannot be so regarded. (Doc. 31-1 at 12.) However, Defendant overstates its case. While Plaintiff did acknowledge that Ms. Lang's favorable treatment during her pregnancy did "not necessarily" support her discrimination claim, the very fact that Ms. Lang was permitted to work as store director while pregnant could be read to undercut *Defendant*'s position. Quite simply, Ms. Lang's favorable treatment indicates that the pregnancy-related restrictions adduced to justify her termination cannot affect the performance of an essential job function. Similarly, a second comparator, Ms. Vidrine, was never fired. As she was unable to lift eighty pounds and yet did not lose her position, she could too reasonably count against Defendant, rather than in its favor.[25] Tellingly, Sutton himself could discern no reasonable difference between the two, blaming HR for the decision, in his own deposition.

---

[24] Winn-Dixie also relies upon *Griffin v. UPS*, 661 F.3d 216 (5th Cir. 2011), an ADA case, to introduce "reasonableness" into our Title VII pregnancy discrimination prima facie test, which does not and never did require it.

[25] Defendant insists that Ms. Vidrine simply did not present any type of work restriction "prior to that time," presumably her leave. (Doc. 31-1 at 13.) It does not say that Ms. Vidrine never asked for an accommodation, nor that she was not accommodated after the leave, as would have to be shown at present for Ms. Vidrine to become an inapposite comparator.

(Doc. 31-5 at 10-11.) In sum, then, both persons could qualify as reasonable comparators, as the PDA treats women "affected by pregnancy . . . the same for all employment-related purposes . . . **as other persons not so affected but similar in their ability or inability to work.**" *Young,* 135 S. Ct. at 1344 (emphasis added) (internal quotation marks omitted). Both pregnant, these two persons were similarly prevented in their ability to perform the kind of task that Defendant now insists Plaintiff's inability to perform justified her firing. In this sense, they can be conjectured to be reasonable comparators in a jury's eyes.

Two problems characterize Defendant's attack on Plaintiff's next comparator, Mr. Drew Robertson ("Robertson"). First, Winn-Dixie argues that Martin's deposition concerning Robertson is "unsupported hearsay." (Doc. 31-2 at 10.) Indeed, all of Martin's knowledge of these circumstances is based on what her friend, the Burbank store floral manager told her, which she allegedly heard from Robertson. (Doc. 31-3 at 21-22.) Thus, the statements appear to be classic hearsay within hearsay and therefore, must conform to hearsay exceptions to be admissible. FED. R. EVID. 801(d)(2). This argument, however, fails. Under 801(d)(2)(D), neither Robertson's alleged statement to the florist nor her statement to Martin are hearsay since (1) Robertson and the florist were employees of Winn-Dixie at the time the statements were made, (2) as individuals working in the same store, Robertson and the florist had a work relationship that clearly falls within the scope of the subject spoken of, and (3) the statements equally regard Robertson's alleged accommodation which is offered to refute Winn-Dixie's statements on the same issue. *See* (Plaintiff's Deposition, Doc. 31-3, 80:23).[26] Therefore, the testimony regarding Robertson qualifies for an exception under Rule 801.

---

[26] Both Mr. Robertson and Ms. Flatau are listed in Plaintiff's initial 26(a) disclosures. (Doc. 31-4.)

More substantively, Robertson is a colorable, if not perfect, comparator. In contesting this issue, i.e. the merits of Martin's use of Robertson as a comparator, Winn-Dixie argues that Robertson is not similar enough to Martin since he did not receive any preferential treatment under "nearly identical circumstances." (Doc. 31-2 at 10 (citing *Luna v. Corrections Corp. of Am.*, 469 F. App'x 301, 304 (5th Cir. Mar. 16, 2012).) Because Martin does not respond, the question is whether Winn-Dixie meets their initial burden of showing that no genuine issue of fact exists as to whether Robertson is not similar enough.[27] Winn-Dixie argues that Robertson's case is not nearly identical because it is unknown how long he was under restriction and he worked at a different store. (Id.). But Winn-Dixie misapplies *Luna*. There the court was applying disparate treatment analysis to the pre-textual and not *prima facie* portion of the *McDonnell Douglas* test. *See Id.* (explaining that "a plaintiff may establish pretext . . . through evidence of disparate treatment . . . under "nearly identical circumstances."). Regardless, , Winn-Dixie cannot dispute that Robertson held the Co-Director position at the Burbank store and worked under a similar lifting restriction (back injury caused by a bar fight) during roughly the same timeframe as Martin's restriction (2012-13). (Doc. 31-2 at 10.) While it is unknown over what duration this restriction continued and Winn-Dixie has "no record of receiving any type of reasonable accommodation request," neither fact is relevant under Rule 56. Quite simply, the facts taken in Martin's favor show that whatever the paperwork situation was, Robertson was allowed to remain in his position for some time until he quit. More particularly, both Robertson and Martin held the same job over roughly the same time period, at suburban Winn-Dixie stores, located within the same cultural and economic area. *See Standifer-Henderson v. Viamedia*, No. 4:12cv636, 13 U.S. Dist. LEXIS 183919, at *15–20, 2014 WL 229341, at *5–6 (E.D. Tex. Jan.

---

[27] Martin apparently gives up on Robertson and focuses on Lemoine and Ivy. (Doc. 38-1 at 11.)

21, 2014) (holding that plaintiff was comparable to two other employees at another working location since they occupied the same position at the same time, even though their actual production output was different). This result coheres with the Fifth Circuit's observation:

> The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared **held the same job** or responsibilities, shared the same supervisor or **had their employment status determined by the same person**, and **have essentially comparable violation histories**. And, critically, the plaintiff's conduct that drew the adverse employment decision must have been "nearly identical" to that of the proffered comparator who allegedly drew dissimilar employment decisions. If the "difference between the plaintiff's conduct and that of those alleged to be similarly situated accounts for the difference in treatment received from the employer," the employees are not similarly situated for the purposes of employment discrimination analysis.

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009) (emphasis added).

Different problems also plague Winn-Dixie's criticism of Plaintiff's use of Mr. Wayne Ivy ("Ivy"). Winn-Dixie argues that Martin should not be able to use Wayne Ivy as a comparator since (1) the 1993 and 2001 injuries he discussed, which gave rise to the restrictions relied up, were too distant in time and (2) there is no actual evidence of a lifting restriction. (Doc. 44 at 6.) Again, Martin fails to respond to Winn-Dixie's specific motion arguments. (Doc. 38-1 at 6; Doc. 41 at 4.) Like Defendant's opposition to Robertson's use, this attack is also misplaced. It is undisputed that Mr. Ivy was serving at a different store (Burbank), but in the same position as Martin when he broke his arm in 1993 and femur in 2001. (Doc. 38-4 at 12). Taking these facts in favor of Martin, a reasonable inference from the condition of a broken arm or leg would be some kind of lifting restriction. Although the Fifth Circuit has found that "[e]mployees with different supervisors . . .  who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated," *Lee*, 574 F.3d at 259, it has not applied this standard when the Plaintiff and not the comparator was

the subject of adverse employment action. Because Winn-Dixie only mentions that time has passed and fails to provide some fact to show the meaning of that passage, Ivy may indeed be found to be an appropriate comparator by a reasoned factfinder.

Fourth, the co-director description, as described and characterized, undercuts the Defendant's stated reason for Plaintiff's termination: that accommodating Martin would have placed an undue burden on the Prairieville store because of the "importance of her ability to lift items" as co-director, "the length of the restrictions . . . and the time of year that she was requesting the accommodation." (Doc. 31-2 at 11; Doc. 44 at 6.) Naturally, "[i]n the context of a discrimination claim, in determining the essential functions of a position, a court may consider, but is not limited to, evidence of the employer's judgment as to which functions are essential, and the written job description in effect before the employee interviewed for the position." Based purely on the job description given by Defendant, one can conjecture that a reasonable jury would find against Defendant, deeming its stated reason for not fully accommodating Plaintiff like it did others with comparable physical limitations to be purely and forbidden pretext. As noted above, being able to personally and physically lift items was never designated as an "essential" or "primary" important aspect of the co-director position. (Doc. 31-4 at 11-13.) Nothing in the Handbook or in Winn-Dixie's testimony that precludes co-directors from asking for help to lift up to eighty (80) pounds or from their using mechanical aides to do so. (*Id.*) Just as noticeably, a co-director is only expected to lift, push, or pull up to eighty pounds  between 1% and 33% of his or her shift and is expected to sit ("frequently," defined as between 34-66%") and to stand and walk ("continuously," defined as between "67-100%") far more frequently (and regularly). (*Id.*) Defendant's counsel, moreover, seemingly conceded as much during Sutton's deposition, objecting: "There's **no** category of ***essential physical*** demands. There's never,

occasionally, frequently, continuously." (Doc. 31-5 at 9 (emphasis added).) True, Sutton seemed to regard such physical tasks as "essential" in one sense—"You may have just one person open a store and have very little backup. And it would be essential that she be able to perform her duties if she was there by herself," (*id.* at 10)—he did not identify lifting, pushing, and pulling as amongst a co-director's essential "duties" when asked to describe that position's "essential" duties. Instead, he intoned: "To assist the store director with whatever he needs, in charge of profits, sales, making sure we attain our budgets, helping direct people in the store, setting ads for the upcoming week, just helping to maintain and run the store." (Doc. 31-5 at 5–6). In fact, only one person—Savoy—has testified that "unloading the trucks" was a "primary responsibilit[y]." (Doc. 31-6 at 5.) Cumulatively weighed, then, Defendant's own job description could greatly discredit their proffered justification, enough for Plaintiff to withstand Rule 56's scrutiny.

Finally, Defendant's offer of a demotion could undercut their stated reason's believability.  Though willing to demote her to cashier over the same time period, Defendant never does explain how that position would involve lifting less. (Doc. 31-4 at 55.) Indeed, cashier is a position that may involve lifting requirements above Martin's stated restrictions, as the Ivy Declaration expressly states. (Doc. 38-4 at 13 (stating cashier lifting requirements are in excess of 10 pounds).) The evidence shows only that the Prairieville store may have been inconvenienced during the Thanksgiving/Christmas holiday season where other employees whose primary job it was to stock shelves and put together displays would not have received the generous help Martin had apparently been giving them. In addition, accepting Plaintiff's pleaded evidence as true, it does seem like other stores have accommodated other co-director with similar physical handicaps.

*3.*      *Conclusion*

For these reasons, Martin defeats summary judgment regarding her prima facie case of pregnancy discrimination. The evidence shows that she is an undisputed member of a protected class, who sought and was denied accommodation. Meanwhile, genuine issues can be discerned as to the existence of deferential treatment in light of Robertson and Ivy as Martin's reasonable, if not indisputable, comparators[28] and the extent to which Defendant's reason is in truth the purest of pretexts.

## C.      Louisiana Discrimination Claim

Because Louisiana law employs an identical standard for adjudicating pregnancy discrimination claims, *see supra* Part IV.D, and because this Court has found the record precludes a granting of summary judgment as to Plaintiff's Title VII claims, *see supra* Part V.B.2–3, this Court will leave Plaintiff's state law discrimination claims for a jury's review.

---

[28] Defendant's strongest argument is against Plaintiff's final comparator, Mr. Jeremy Lemoine. Defendant argues the latter is an improper comparator since (1) he worked at a different store, (2) which Martin fails to show the staffing needs of were similar to the store she worked at, or (2) since there is a lack of evidence that the operational needs for the time of year were similar to her situation. ( Doc. 31-2 at 11; Doc. 44 at 6.) In support of their assertion, Winn-Dixie points to the fact that Lemoine was "placed on light duty with standing, walking, and lifting restrictions for two months beginning in mid-June 2012." (Doc. 31-2 at 11.) In contrast, Martin asserts that Lemoine is a proper comparator since (1) he was a store manager, (2) at one of the busiest stores in the Baton Rouge area (Central), and (3) was severely injured in a car accident, yet accommodated in a wheelchair in his position, after returning from a leave of absence. Despite these contentions, even taking the evidence and reasonable inferences in favor of Plaintiff, Lemoine's situation is not nearly identical as he was under medical restrictions for less than half the time Martin was. And even though Central might have been a busy store, it is further away and there is no evidence of its staffing or operations. Additionally, Lemoine was able to return to work right after his short leave of absence, but Martin extended her leave. In defeating this one comparator, however, Defendant has not defeated *all* of Plaintiff's evidence.

**D.** **Harassment Claims**

Two remarks form the universe entire of Plaintiff's harassment claims under both federal and state law. On one occasion, Sutton offered the Plaintiff, a diabetic, candy; on another, he allegedly claimed that Plaintiff "couldn't do [her] job as Co-Director and be pregnant."[29] Plaintiff deems these statements actionable.[30] (Doc. 38-1 at 17–18.) Winn-Dixie avers that, even assuming that these incidents came to pass, they are too few and too isolated to constitute harassment, as a matter of law. (Doc. 44 at 8.)

While the latter claim can constitute circumstantial evidence of discrimination, Title VII harassment claims are analyzed differently than Title VII harassment ones. As noted above, *see supra* Part IV.C, an environment's hostility is measured by the totality of the circumstances, *Harris v. Forklift Systems*, Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993), a longstanding interpretation not reversed by the PDA's adoption, *see supra* Part IV.B. This test incorporates subjective and objective elements: "The plaintiff must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable." *Hancock v. Barron Builders & Mgmt. Co.*, 523 F. Supp. 2d 571, 575 (S.D. Tex. 2007). "The mere utterance of an epithet which engenders offensive feelings in an employee is insufficient, without more, to support Title VII liability," *Weller v. Citation Oil & Gas Corp.,* 84 F.3d 191, 194 (5th Cir. 1996), and "more than a few isolated incidents" must be evidenced for harassment verboten under Title VII to be demonstrated, *Davis v. Potter*, No. 03-1796, 2005 U.S. Dist. LEXIS 33794, at *18, 2005 WL 3359180, at *6 (W.D. La. Dec. 9, 2005).

---

[29] Although Winn-Dixie generally disputes that "neither Mr. Sutton, Ms. Savoy nor anyone else at Winn-Dixie made any inappropriate pregnancy- or gender-based comments," (Doc. 31-1 ¶ 86), they do not dispute that Sutton made this particular comment.

[30] The first, technically, does not deal with sexual discrimination of any kind. Nonetheless, it is summarized here so as to highlight the paucity of Plaintiff's factual support.

Here, Sutton's pregnancy-related comment is the only one by an agent of Winn-Dixie that Martin alleges is sexually discriminatory. Wedded to the totality test, courts have simply not found such off hand remarks to be protected under Title VII; far more has long been required. *Lauderdale v. Tex. Dep't of Crim. Justice*, 512 F.3d 157, 164 (5th Cir. 2007). With Plaintiff's harassment claims predicated on at most two stray remarks, they cannot stand, and Rule 56 compels summary judgment in Defendant's favor as to her meager harassment allegations.

**E.      IIED Claim**

As to Plaintiff's state law IIED claim, Defendant argues that (1) there is no evidence of their intent to inflict severe emotional distress or knowledge that such would result, (2) there is no evidence of severe distress and, (3) even assuming discriminatory conduct occurred, it did not rise to the level of outrageousness, as a matter of law. (Doc. 31-2 at 17.) Martin seems to respond that Winn-Dixie knew or should have known their actions would cause her emotional distress since (1) they forced her into leave, (2) reduced her income (via requirement of FMLA leave and disability), and (3) obviously created uncertainty regarding her then long-terms good standing with the company. (Doc. 38-1 at 18.) She also argues that she did suffer emotional distress because "she was pregnant, under financial distress, and extremely worried about losing her health insurance," which resulted in drug treatment for high blood pressure. (*Id.*) Finally, Martin avers that reasonable jurors could conclude Winn-Dixie's requirement for her to take leave and her eventual termination was outrageous under the circumstances. (*Id.*)

Under Louisiana law, conduct rises to the level of outrageousness, only where it "go[es] beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community," and "[l]iability does not extend to mere insults, indignities, threats,

annoyances, petty oppressions, or other trivialities" or "where the actor has done no more than to insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional stress." *White*, 585 So.2d at 1210 (citing RESTATEMENT (SECOND) OF TORTS § 46, cmt. g). As such, liability has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time.

Applying this law, Plaintiff's claim fails Rule 56's test for two reasons.

First, however insensitive Sutton and Defendant may seem, it was Martin who first brought her pregnancy to Winn-Dixie's attention, and only within a month of finding out. Nevertheless, she, as a reasonable woman, might agreed to take her OB/GYN's recommendation to adhere to work-hour and lifting restrictions. In many ways, Defendant's actions were run of the mill. Presented with restrictions which Winn-Dixie argues necessarily disqualified Plaintiff as a co-director, Defendant allowed her to take and extend leave and warned her of the consequences of her failure to take a demotion—termination in the case she is replaced before she returned. (Doc. 31-4 at 45.) In these circumstances, courts have declined to find conduct akin to Defendant's as outrageous even where the employer fired the Plaintiff just before or even the day of delivery of her child. *Pate v. Pontchartrain Partners*, LLC, No. 13–6366, 2014 U.S. Dist. LEXIS 157743, at *7–8, 2014 WL 5810521, at *4 (E.D. La. November, 7, 2014) (discussing several other district court cases involving Plaintiff's in good and below-average standing with the employer). Indeed, after reviewing national jurisprudence, the Supreme Court of Louisiana chose to cite one case of employment termination during pregnancy as an example of conduct that was "merely tortuous [sic] or illegal [and] does not rise to the level of being extreme and outrageous." *Nicholas v. Allstate Ins. Co.*, 765 So. 2d 1017, 1025 (La. 2000).

Even assuming Defendant's conduct was outrageous and extreme, Plaintiff has testified that she felt horrible, humiliated, and upset, but she has not shown that "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case," *Aronzon v. Sw. Airlines*, No. 03-394, 2004 U.S. Dist. LEXIS 249, at *18, 2004 WL 57079, at *6 (E.D. La. Jan. 9, 2004) (quoting *Norred v. Radisson Hotel Corp.*, 665 So. 2d 753, 756 (La. Ct. App. 1995), and, *Magee v. Pittman*, 761 So. 2d 731, 752 (La. Ct. App. 2000)). Over the entire course of discovery, she has produced no evidence of a single doctor's visit or a single prescription for such potentially serious conditions of emotional turmoil. One prescription—for high blood pressure—has been adduced, but the Fifth Circuit has itself discounted such a medical problem as evidence of extreme emotional distress under a similar Texas law. *See Carroll v. Hoechst Celenese Corp.*, No. 98-41056, 1999 U.S. App. LEXIS 39562, at *23–24, 1999 WL 1330688, at *9 (5th Cir. December 17, 1999) (holding that a woman's mild levels of fear, anxiety, fatigue, high blood pressure, and depression did not constitute severe emotional distress).

## VI.   CONCLUSION

In accordance with Rule 56, courts must isolate and dispose of factually unsupported claims or defenses, thereby helping to ensure the speedy, efficient, and just adjudication of every action, and resolve all reasonable doubts in favor of the party opposing summary judgment. After a review of every relevant motion, two inescapable conclusions follow. Plaintiff's discrimination claims remain viable, for enough evidence has been provided to allow a reasonable factfinder to find in Plaintiff's—or in Defendant's—favor. Others who may be found factually similar were accorded the type of accommodations denied to Plaintiff, and Defendant's

reasons can be reasonably doubted. Conversely, not nearly enough evidence has been uncovered and presented to support Plaintiff's IIED and harassment allegations. More than a few comments and a nearly bare medical record are necessary under federal and state law. But Plaintiff offered no more.

Accordingly, for the foregoing reasons, this Court DENIES Defendant's MSJ as to Plaintiff's discrimination claims under federal and state law and GRANTS Defendant's MSJ as to Plaintiff's harassment and IIED claims.

Signed in Baton Rouge, Louisiana, on September 24, 2015.


_____
JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA